May it please the Court, I am John Phillips, appearing on behalf of Mr. Peck, a claimant for Social Security Disability Benefits. I did want to make one thing clear in my reply brief on page 4. I have the statement that unfortunately I noticed last night that the judge rejected Barker's evaluation. I don't know where that came from. Please strike it. It's unclear where that came from. But he does discredit Parker. He doesn't accept Parker. Yes, sir. Yes, sir. But, however, he used the Barker report to, of course, reject the two reports of the treating physician. You had something about a five-minute examination. Yes, sir. It looked as though Parker or perhaps some assistant in his office filled out a lot of information. Yes, sir. Is there something in the record that shows it was just a five-minute clinical examination? What's in the record is my statement in my motion to strike that report that it was five minutes. The only other thing that's in the record is the judge's acceptance of that five-minute figure. But does he say it's only five minutes? Yes, sir. He says that he was concerned about the lack of findings in the five-minute, and he puts it in quotes, examination. Yes, I don't know that that's a finding. Let me ask you this. You obviously were not present at the examination. No, sir. Just the claimant and his wife. Your claimant was on the stand. Yes, sir. Why didn't you ask him how long the examination was? At that point, the motion had been denied. Well, it hadn't been denied, but the credibility was at issue. But what you say is not evidence. I understand, Judge. And you had the opportunity to put evidence into the record, and you're now trying to use the idea that it was a five-minute examination or a very short examination to try to discredit it. Obviously, you would have liked to have had something in the record. Why didn't you ask him? Well, sir, the way these administrative law judge hearings work is you make your motion, which actually – and then the judge does what he's going to do with the motion. And then at that point, you go through with the hearing. I understand that. But what I'm saying is even if he declines to strike, the weight attached to it – and as he says, listen, I'm not going to strike, but I will do something about what weight I attach. It would have been relevant, I think, had he known for sure that it was only five minutes or had he had evidence in the record that that was so. Would the record be more complete with that testimony? Yes, Judge. I agree. Also, the Barker letter or report says that he tests positive for the – I don't know how to pronounce it – Waddell and Hoover tests. Yes, sir. And I noticed that you did not ask your client on the stand whether specific tests were done. I mean, for example, the axial loading test Barker says he did, you don't ask your client whether he did those things. As I view it, the ALJ held against you probably because of Barker's report that he's malingering because he fails to pass these tests. That is one of the reasons that the ALJ rejected the doctor's report. Dr. Barker, however, does not describe, first of all, what a Waddell's test is. But, of course, the ALJ knows what it is. That's not in the record. I don't know if the ALJ knows or not. One of the things that – two things on that. One of the things that the judge may be unaware of what Waddell's tells us is that, number one, it requires three of five findings. The doctor only lists the one. And also, the way he lists it sounds like he generated this finding based on the claimant's testimony because the claimant testified that his numbness and pain was, from his comment, it sounded like it was non-organic. And so that's where Dr. Barker mentions his Waddell finding. Counsel, is there anything in the record to show what Dr. Barker's specialty, if any, is? I know Dr. Soski is a board-certified orthopedic surgeon. I couldn't tell what Dr. Barker was. Nothing. Let me ask you about something else. Nothing. I don't understand your answer. Nothing in the record or has no specialty? Nothing in the record. I don't believe he has any specialty. I don't know. You don't know. I'm aware that he's a general practitioner and he sees only Social Security claimants. I'm aware of this. But the record doesn't show it? The record, other than my, again, my assertion in my motion that this is all he does. An assertion in a motion just doesn't we can't use it. I understand. Let me ask you about something else, the TV watching. I was most curious to know how the man watched TV because the ALJ used it as something that bore on the credibility of his testimony that he could not sit for extended periods. I didn't see a question that brought out whether he sits in a chair or uses a recliner all the way back or uses a sofa or props himself up in bed or what. Did anyone ask him? There is, nobody asked him at the hearing. There is record evidence of this. The judge said that he sat all day watching TV. And also Dr. Barker says that he watched TV all day. There is no testimony that he sat all day watching TV. And, in fact, at page 112 of the report, which is of the record, which is the claimant's disability report, he states that he lays on the couch, he's on the couch watching TV. Then he'll go over and mess with his computer, checking e-mails. Then he'll go back to the couch and watch TV. And then he'll go and sit outside and think about his situation and ruminate on his pain. What exactly is his physical disability? He had a motorcycle accident. Yes, sir. That's a very good question. He had a serious compounded fracture of his right leg. Okay, but people break their legs and they get better. Yes, sir. They had to put a 17-inch rod in his leg that stays there. They are not able to take it out. This is causing pain. He uses a cane. He also has pain when he sits and stands. Now, here's a crucial part. The administration hired Dr. Barker to close a hole. They didn't have any information on the back, the spine. Now, the claimant says he gets back pain from sitting and standing too long. Dr. Barker obtained a spinal X-ray, and his report is almost completely on the spinal problem. He doesn't even, he says that the scar is well healed, and he mentions on the leg, he mentions that the claimant advised him he had a broken leg. But then he goes through a bunch of back tests, straight leg raising and things like that. He never gets to the leg. Now, he does get to make sure, he gets to apparently the test that he's not colorblind. That's in there. He does get to the test that his acuity far and near are fine. He gets to the test that his hearing is not impacted. He gets to the test that his speech is not impacted. He gets to tests, including some kind of wattle sign from the claimant's comment, not an actual test. He gets to those, all of those tests, reviewing the spine. He missed it. This is like the Widmark case, where they had a thumb problem that was not properly evaluated by the examiner. Why can't he work with leg pain and back pain? Constant pain. It's distracted. He says it interferes with his concentration. He's also not able to ambulate adequately. They have to put him in the security job, security guard job. What happens with that is there's a fair bit of walking and things like that. That's the testimony that's in the record. Well, if you're right, if you win today, what happens? Do we send it back to the ALJ to come up with a different residual functional capacity assessment and then have another determination of what he can do given his correct limitations? Is that what you're asking for? I believe it's too late. Doctor, the judge rejected the treating physician's RFCs, residual functional capacity evaluations. Those are in the record. Okay, if we say that's wrong, the judge should have accepted those RFC findings by Dr. Scioscia. Yes, sir. Then he goes back to the ALJ and he reevaluates what your guy can do given the RFC that Dr. Scioscia opines about. I would suggest that this is a case where it's already plateaued. If I've answered the question, I'd like to reserve it. I don't understand your answer to my question. I'm sorry, and I kind of shortened it. The condition is plateaued according to the doctor's findings. So I suppose you can go back now and determine whether or not he was disabled perhaps back in 2005. But I don't know that that is something. Doesn't the ALJ have to go back and say, okay, now that I know you can only sit for X hours and you can only stand for Y hours, I have to look and see what kind of job you can do with these limitations, if anything? Let me try to answer that question again because I was not clear. The problem with that is his insured status ended in December of 2005. So what we'd have to do is have a time machine to go back prior to that date. So what would you have us do today? If you win, what would you have us do? I would have you order the secretary to award benefits and remand for calculation of those benefits. Without any finding by the ALJ of what his residual functional capacity is, given Dr. Socha's recommendation? Well, actually, we already have the VE's testimony at which the judge asked the VE if Dr. Socha's RFCs were used. The VE said no work. That's in the record. I saw that. Let me ask you this, though, and I apologize for running you over time, but there's enough detail in this that it may be worth spending some more time on it. Yes, sir. Dr. Socha is a treating physician in the sense that he treated the leg. He's an orthopedist. But his opinion that we get in the record is not arising directly out of his treatment. I gather that he treats both Mr. Peck and Mrs. Peck. Mr. Peck comes back in quite some time after his leg is basically healed up enough. He's no longer being actively treated by Dr. Socha. And Dr. Socha says, okay, here's the disability from which you're suffering, but it's not as though this is either directly in his expertise as to what his back problems might be, nor is it part of a continuing course of treatment, because at the time Dr. Socha gives that evaluation, he's no longer being actively treated. Do you have some response to that? The reason I'm saying that is there's some reason to treat this a little bit differently from, I've been treating this patient for five years, he's still under my active care, and here's what I know. Here's the situation. Dr. Socha did the surgery immediately in June of 2006. We have records from him that end at a certain point in 2002. I think I said 2006. It's actually 2000. Ending in 2002. And then we have the other treater, Hortiz, I believe his name is, is treating him. He is prescribing the only thing apparently that is left to him, which is pain medication. Dr. Socha did not recommend physical therapy. He did not recommend further surgery. This man is in the condition he's in. And then later, in June of 2003, he does a full evaluation of his work, basically, that he had done years before, or not years before, he has seen the man less than a year prior. And then at that, I think it's nine months, and then at that point he issues his RFC based on not only his treatment history, he's the guy that worked on the leg. But he never treated the back? No. There was nothing wrong, well, very minor degenerative changes are what shows up in the X-ray, but that wasn't what Dr. Socha was looking at, because it wasn't relevant. What was relevant is the leg. And Dr. Barker didn't get to that. As I recall, he had a nonunion on the leg. Yes, sir. That's why he got the rod in his leg, and now the bone has been, albeit behind schedule, mending. Is that correct? What happened was is that the rod was placed in, and then you'll see from Dr. Socha's reports, there is malunion after that point. The reason why they put the rod in is because it was a complex comminuted fracture open. I'm kind of squeamish sometimes, even though I've been doing this for 20 years. You read the operative report, and maybe it's because I had a broken leg too, but in any event, it's a serious, serious problem. And the only thing they could do was put the rod in, and it can't come out, or I suppose they would have taken it out. They did take the wife's material out, but she still sounds somewhat bedridden. Thank you, counsel. Thank you very much. May I have some for rebuttal since I've gone over? We've gone well over your time, but I think you can anticipate 30 seconds in case something comes up that you need to respond to. Okay. Good morning. My name is Mark Winn, appearing for the Commission of Social Security. The ALJ's decision is supported by medical opinions of Dr. Barker, Dr. Doss. Let me ask you about Dr. Barker. I couldn't tell what kind of doctor he was. He didn't have a letterhead. He just had the State Department letterhead. Is there anything in the record that tells us whether he's board certified, and if so, in what? The record does indicate he's a medical doctor. I'm sorry. I didn't hear. He's an M.D., and the claimant in his motion to strike. I know he's a medical doctor. Do you know what I mean about? He's licensed in the State of Arizona. Do you know what board certification is?  And there's no indication of what board certification he has as far as being a specialty. Is there indication of whether he has the board certification? I know there's not. It's not in the record. Does he have it? Much of the claimant's argument depends on his rejection of Dr. Barker. Let me ask you about something else. The television. It looked like nobody asked him in the testimony, how do you watch TV for so long if you can't sit? Your opposing counsel has pointed to a place in the record where he tells his doctor that he lies on a sofa. Big difference in unloading the spine. Do you have anything in the record that shows the contrary, that he sits as he would have to in a job? I believe in the record, in his testimony, he does say that. Show me where. He either enters first. I know for one, going back to at least the 215. Just give us the page number. 215 of the record.  This is related for 213, in fact. It's related to the, not by the TV use, by the computer use, which is closely related to the ALJ's findings. But he could sit. The only difference is that he spends, in the middle of the history section on page 213, it says he spends most of his time in sitting. No, that's what Barker says. That's what Barker says. How about in the record of what he says or what he's written? Just to respond to that, the history is taking down history as related by the claimant himself, though. Well, maybe. That's what Barker says. That's what Barker says. Dr. Barker got a few things wrong. In fact, the ALJ specifically rejects Barker's opinion when it comes to residual functional capacity. He rejects part of the lifting and part of the, and he does, he does reduce the lifting and somewhat the walking and standing requirements of Dr. Barker. What do we do about that? The ALJ is entitled to resolve the conflicts in medical evidence and all social security cases. Medical opinions over here, for example, are not from Dr. Barker alone, but from Dr. Kahn, Dr. Well, speaking of Dr. Kahn, Dr. Kahn never saw the patient. Never saw the patient. But did have access to the records not only of Dr. Barker, but of Dr. Scioscia. Is there anything in the record that shows how long Dr. Barker talked to the patient? No, there's not. But looking at the examination itself, 213 to 215, we do see that he takes a very detailed history. Well, that's actually why I asked, because sometimes you go to a doctor and he talks to you for 45 minutes and gets all this detail, and sometimes the nurse or receptionist or somebody else gets it all and the doctor whizzes in and out in 30 seconds. And I can't tell which it is without testimony. And there's no evidence in the record that there was nothing else but a complete examination. There's history, for one, but when we go to the actual physical examination of the claimant, that wouldn't be done by a receptionist. And that was — Well, that's what he says. That's what he says. And there's no reason to contradict him. Here's what concerns me. There are three doctors who are principally involved in this. There's Dr. Scioscia, who's been treating the guy. There's Dr. Barker, who has one exam, and the ALJ finds a mistake in it and rejects part of it. And then there's Dr. Kahn, who never saw the patient at all. So with that lineup, I'm having a hard time understanding how he can reject Dr. Scioscia. When we look at the actual documents that Dr. Scioscia filled out regarding — Could you pull the mic a little closer to your mouth? Thanks. When we look at the actual documents that Dr. Scioscia actually submitted, for example, he submits a mental evaluation which has no support whatsoever, no diagnosis, no mental status evaluation, whereas there is evidence, for example, with regard to mental with Dr. Das, who found that the claimant had no problems in mental functioning. And when we go to even Dr. Scioscia's physical — I don't understand what you mean by no foundation. I thought Dr. Scioscia saw the guy and talked to him. Talked to him. But when we think about, especially as an orthopedist, that has nothing to do with mental — They use it to help sort out whether the pain is due to the damage to the skeleton and tissues around it, or whether the pain is due to secondary gain, or whether the pain is due to perhaps a post-traumatic syndrome. They see all those things and pay attention to them. Yes. That was first talking about the mental — his mental — They also sort out people that they think are lying so that they — because it affects the decisions what medicines to give them. Because if you go back to either his physical — one thing that the law requires, though, and the regulations require is that for any physician, treating or otherwise, they have to support their medical findings with actual laboratory tests, actual examination findings. And for both Dr. Scioscia's mental findings and his physical findings, there's complete lack of that. And when that's compared to the very detailed findings that Dr. Barker found and the discussion by Dr. Kahn. And there's also another doctor, in addition to Dr. Kahn, who reviewed the record. So Dr. Schreiber at page 226 of the record. And we can identify him by looking at page 30. Because his name is illegible on — in the record in his own report. But he also agreed with AOJ's findings, ultimately, that — Who is this doctor in 226? This is also — like Dr. Kahn was a physician who reviewed the medical evidence of record. That's the fourthest conclusion. That's why I asked. Is this Dr. Kahn? Dr. Kahn also is a state agency physician who reviewed the medical evidence of record. Dr. Scioscia's and Dr. Barker's. Okay. And what is their — in 226, is this Dr. Kahn? This one would be Dr. Schreiber. Right. This is Dr. Schreiber who has the illegible signature, Dr. Schreiber? Yes. That is correct. And I can identify him by looking at a supplemental report that summarizes the finding on page 30. Okay. And what should I be looking at in Dr. Schreiber's report? You should be looking over on page 227, where he does give his opinion of the exertional limitations that the claimant has. But he's doing this based on what? Based on the medical evidence of record, including Dr. Scioscia's medical treatment records and the treatment records of the claimant's other physicians, Dr. Horiadis, as well as Dr. Barker's. But he is, of course, not physically seeing Mr. Peck. He's not physically seeing Mr. Peck. Right. So he's just saying, here's how I read this. He's not an independent witness, of course. And the regulations do say that these physicians, they're highly qualified physicians and psychologists who Are they highly qualified whether they're the doctor for the claimant or whether they're the doctor for the Social Security Administration? Or only if Well, in all these cases, medical opinions come from You just told us to ignore an opinion where Dr. Scioscia doesn't support it with x-rays and MRIs and stuff. This fellow never saw the patient. I can't read what he wrote. And it looks like he has checks in boxes. And I don't understand what it is that you're trying to persuade us to accept from this. He does make, both Dr. Kahn and Dr. Freiberg do make some notes about their findings, which include findings about medical record as well as Dr. Barker's, whose findings are very legible and very detailed, far more detailed than anything that Dr. Scioscia ever wrote. Yeah, I have to say, here's what bothers me about this case. We have some suggestion, at least, that Dr. Barker is less than thorough in his examination. Although, as you could tell from my questioning of your adversary, I'm a little nervous that we didn't actually ask Mr. Peck how long the examination was or what it consisted of. But it's quite striking that Dr. Barker finds him testing positive for Waddell, that is to say malingering, with respect to his back. Well, he does complain about his back, but the centerpiece of his complaint is about his leg. And Mr. Phillips has pointed out quite accurately that Dr. Barker doesn't talk much about his leg. I would disagree with. Okay, where does Dr. Barker talk about his leg? That would be on page 215 of the record. Yeah, I'm seeing sort of various flexions and so on. But he doesn't talk about pain.  Okay. But he has, in the middle of the physical examination, there is no crepitation of his knees and no instability of his knees. Where are you reading? I'm reading about the middle of the section captioned physical examination. On page 214? Page 214. That full paragraph? Okay. Yes. Okay. So no crepitation of his knees. And no instability of his knees. Okay. And that goes very directly to many of his complaints. As well, there's no ‑‑ he has full range of motion of the right knee and the right ankle as well. No talk about pain? The pain, I mean, he basically is complaining not that I can't move it, but that it hurts. Yes. And Dr. Barker tests as to whether or not he's feeling pain with his back. That's what the Waddell test is designed to do. But he doesn't say much, if anything, about pain in his leg. The knees are different from the leg. The knees you get as your meniscus dries out, tears and whatnot. You get arthritic developments on the bottom of the kneecap. The common knooted fracture of the leg, different place. What should we look at for that? He was able to also sit comfortably, stand up symmetrically. He could raise on his heels and toes, squat to 90 degrees. He had a cane, but he was able to perform all these activities without the cane. He was also able to get off the examination table, dress, and undress without the use of the cane, and had no difficulty doing this other than limited by his obesity. Did Dr. Barker get an MRI? He got an X-ray of the spine. And we can't downplay the fact that the spine became a complaint of the claimant, especially by the June 3, 2003 visit to Dr. Socha, whom he had just returned to after nine months of not seeing him. So it would be inaccurate to say that this back is not an issue. It was an issue brought up by the claimant himself. And the records, the fact that Dr. Barker even obtained an X-ray of the spine, shows that his inquiry into this whole matter was far more than the claimant's attorney is claiming. And that X-ray found no acute process of the spine. Thank you, counsel. We've gone way over time, but it seems fair to just leave a shot for the appellate court. What, 30 seconds? Maybe not that long. If the secretary loses Barker, he loses both the Disability Determination Service evaluators, because they not only rely on Barker, they quote him. They put it out of order, but the words are the same. Also, objective evidence on the knee. Dr. Socha, in his records, repeatedly refers to X-rays of the knee. We have objective evidence. I'm sorry. Severity. I should know this, but I read it before. I'm having trouble putting my hands on the most recent evaluation from Dr. Socha. Where is that in the ER? The last one where he comes back in and says, here's how I see Mr. Packnality's come back in. The residual functional capacity or the examination note. Is that the June 3rd visit? The June 3rd 203 visit was. Is that page 267 or should we look at something else? Yeah. The doctor's report. Yeah, no, this is the one I meant. Judge Kleinfeld is right. It is the June 3rd. 265 and 266. He did find that no work could occur, and we ask that Mr. Peck be granted the Social Security Disability Insurance benefits that he has paid for in his taxes. Mr. Wynn says that Dr. Barker looked at an X-ray. Is that your recollection too? Who said that? I'm sorry. Right. He looked at a spinal X-ray. Nothing of the leg. And the other report that Mr. Wynn talks about. Barker looked at an X-ray of the spine, not the leg. Exactly. The other report is the signature is completely unreadable, and under the regulations, you have to know who the person is. You didn't know it was Saul Schreiber? No. Have you ever heard of Saul Schreiber? No. I have never, and I don't know, they also claim he's a psychologist or a psychiatrist. I'm from Phoenix, and I can tell you Saul Schreiber is a knee surgeon in Phoenix. Really? Yes. I'm from Prescott. I don't get down to Phoenix all that often, Judge. I appreciate the information. That's who he is. Anything else? Yes. I'm reading the June 3rd evaluation from Dr. Scioscia. Among other things, Dr. Scioscia says he can't sit for more than a few hours because of the back pain. Yes, sir. And that's directly sort of confronted by Dr. Barker saying he tests positive on three of the Waddell signs, and Dr. Barker goes through three of them, axial loading. I mean, he names them. What am I supposed to do with that? How do I get past Dr. Barker's finding that he's malingering as to the back pain? The back pain that Dr. Scioscia talks about doesn't necessarily come from the spine, as we've talked about earlier. As far as Waddell's, here's how you get beyond that. As I quoted in my brief, Dr. Waddell says this is not a test for malingering. There's one opinion, published opinion, that mentions Waddell's test. It doesn't say how to handle it, actually. But the doctor, the author says this is not a malingering test. This is to assist in treatment. Okay. Thank you. Thank you. Thank you very much. Appreciate your time. Peck v. Astor was submitted. Monroe v. Farwell will not be heard today. Barrios-Escobar v. Keisler was submitted. Joshi v. Keisler was submitted. Hung v. Keisler was submitted.
judges: Kleinfeld, Silverman, W. Fletcher